John J. Nelson (SBN 317598)
**MILBERG PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Telephone: (858) 209-6941
Email: jnelson@milberg.com

*Interim Lead Counsel for Plaintiffs and Proposed Class*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANSISCO DIVISION**

*In Re Mercor.IO Corporation Data Breach Litigation.*

Case No.: 3:26-cv-02821-WHO

**CONSOLIDATED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

1

Plaintiffs Christopher Deboni, Lisa Gill, Tyler Housley, NaTivia Esson, Jelani Lofton, Elana Ramos, Craig Smith, and Vineeth Ananthula ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), and on behalf of the general public, bring this Consolidated Class Action Complaint, against Defendant Mercor.IO Corporation ("Mercor" or "Defendant") based on personal knowledge and the investigation of counsel, and allege as follows:

**INTRODUCTION**

1.    With this action, Plaintiffs seek to hold Defendant responsible for the harms it caused Plaintiffs and similarly situated persons in the preventable breach of Defendant's inadequately protected computer network ("Data Breach") resulting in the disclosure of the sensitive personal information of its current and former applicants, employees, and contractors (i.e., "Class Members" or the "Class").

2.    Mercor is an American artificial intelligence hiring startup that provides experts to train AI models and chatbots.[1] Mercor advertises itself as "the global leader in recruiting experts to train, shape, and advance artificial intelligence models."[2]

3.    Mercor is a "platform that connects global talent with companies" through an "AI vetting process [that] identifies exceptional individuals from around the world and matches them with the best opportunities."[3]

4.    Mercor's "AI assessment system drives instant sourcing between clients and experts" and allows it to "identify the best-fitting candidates across the globe at an accelerated rate."[4] Mercor claims that its "reliable AI vetting process helps [it] identify top-tier experts based on their skills and fit for every role available

---

[1] *About Mercor*, MERCOR, https://mercorca.com/about/.
[2] *Id.*
[3] *Frequently Asked Questions*, MERCOR, https://work.mercor.com/faq.
[4] *Id.*

on our platform, and quickly connects these experts to appropriate client projects."[5] Mercor "use[s] information provided by candidates to evaluate how well-suited they seem for specific roles."[6]

5. In the course of performing these services, Defendant obtained and stored the highly sensitive personal information of Plaintiffs and Class Members for purposes of connecting them with employment and/or contracting opportunities. Defendant obtained highly specific and granular information on employment candidates including screenshots of their computer screens, resume information, candidate profiles, interview recordings, onboarding documents, contact information, W-9 information, passport and other government issued ID scans, Social Security numbers, and Know Your Customer ("KYC") information (collectively, "Private Information").

6. Mercor confirms on its website that it obtains and stores Private Information including Social Security numbers.[7] Specifically, Mercor explains on its "Taxes and Work Authorization" webpage that:

    a. "When accepting your offer . . . If you're a US citizen or permanent resident . . . You are required to complete a W9 form to furnish your Social Security Number (SSN) and to certify your tax status."[8]

    b. "W9 Tax Form . . . It collects your Social Security Number (SSN) or Taxpayer Identification Number (TIN) to enable Mercor to issue a Form 1099-NEC at the conclusion of the tax year, if applicable.

---

[5] *Id.*

[6] *Id.*

[7] *Taxes and Work Authorization*, MERCOR, https://talent.docs.mercor.com/policies/taxes-work-authorization.

[8] *Id*.

You will complete the W9 form upon acceptance of your offer from Mercor."[9]

    c. "Ensure your SSN/EIN is correctly entered and that your legal name in Stripe matches your W-9 exactly."[10]

7. Plaintiffs' and Class Members' sensitive and confidential Private Information—which they entrusted to Defendant on the mutual understanding that Defendant would protect it against disclosure—was targeted, compromised and unlawfully accessed due to the Data Breach.

8. The Private Information compromised in the Data Breach includes Plaintiffs' and Class Members' full names, Social Security numbers, and other biometric and employment related information including video interview recordings and identity verification documents.[11] The cybercriminals responsible for the Data Breach were also able to access other sensitive data from Mercor's systems including candidate profiles, employer data, user accounts and credentials, video interviews, proprietary information, source code, keys and secrets, and Tailscale VPN data (collectively with above "Private Information").[12]

9. Plaintiffs and Class Members directly provided Private Information—including their Social Security numbers—to Mercor in exchange for receiving employment opportunities.

10. By taking possession and control of Plaintiffs' and Class Members' Private Information, Defendant assumed a duty to securely store and protect it.

---

[9] *Id*.

[10] *Id*.

[11] *See* Justin Beals, *The Mercor breach exposed Silicon Valley's fragile AI supply chain*, STRIKE GRAPH (APR. 8, 2026), https://www.strikegraph.com/blog/the-mercor-breach-exposed-silicon-valleys-fragile-ai-supply-chain.

[12] Ionut Arghire, *Mercor Hit by LiteLLM Supply Chain Attack*, SECURITYWEEK (Apr. 2, 2026), https://www.securityweek.com/mercor-hit-by-litellm-supply-chain-attack/.

11.    Defendant breached this duty and betrayed the trust of Plaintiffs and Class Members by failing to properly safeguard and protect their Private Information, thus enabling cybercriminals to access, acquire, appropriate, compromise, disclose, encumber, exfiltrate, release, steal, misuse, and/or view it.

12.    The Private Information compromised in the Data Breach was targeted and exfiltrated by cyber-criminals and remains in the hands of those cyber-criminals who target such information for its value to identity thieves.

13.    On or about March 31, 2026, Mercor began emailing Plaintiffs and other Class Members notice of a security event that impacted their systems. While the email notice contained almost nothing in terms of relevant information, based on information released by public news outlets, cybercriminals were able to access Mercor's systems through a "cascading supply chain attack on LiteLLM — an open-source AI gateway downloaded 95 million times per month" and that through this intrusion the threat actor was able to extract 4 terabytes of data held by Mercor including the personal data of approximately 40,000 contractors, proprietary source code, video interviews, and potentially the AI training methodologies of multiple frontier labs.[13]

14.    The Data Breach was a collaboration between two independent cybercriminal groups: "Lapsus$" and "Team PCP."[14] Following the Data Breach, Lapsus$ shared samples of the data taken from Mercor with members of the media and published data—that it acquired from Mercor during the Data Breach—on the Dark Web for other nefarious actors to access and misuse.[15]

---

[13] *See* Beals, *supra* note 7.

[14] *Id.*; *see also* Jagmeet Singh, *Mercor says it was hit by cyberattack tied to compromise of open source LiteLLM project*, TECHCRUNCH (MAR. 31, 2026), https://techcrunch.com/2026/03/31/mercor-says-it-was-hit-by-cyberattack-tied-to-compromise-of-open-source-litellm-project/.

[15] Singh, *supra* note 10.

15. For context, the Federal Trade Commission has explained that "data stolen from businesses ends up on the dark web where criminals buy and sell it to commit fraud, get fake identity documents, or fund their criminal organizations."[16]

16. Defendant's email notice obfuscated the nature of the Data Breach and the threat it posed by failing to inform Plaintiffs and the Class of how the Data Breach happened, when the Data Breach actually occurred, and even what Private Information belonging to Plaintiffs and Class Members cybercriminals had gained access to. Defendant has also not disclosed or clarified to Plaintiffs and Class Members how many people were impacted in total, how exactly the Data Breach occurred, how the cybercriminals accessed Defendant's systems and the root cause of the Data Breach, whether the exfiltrated information was encrypted or anonymized, or what specific remedial steps Defendant has taken to safeguard Private Information within its systems and networks (or otherwise purge unnecessary information) and to prevent further cyberattacks going forward. Without these critical details, Plaintiff and Class Members cannot meaningfully mitigate the resulting effects of the Data Breach. To date, Plaintiffs have not been provided with formal notice of the Data Breach.

17. Defendant's failure to adequately report and provide Plaintiffs and the Class Members with notice of the Data Breach made the victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their Private Information.

18. Defendant knew or should have known that each victim of the Data Breach deserved prompt and adequate notice of the Data Breach and assistance in mitigating the effects of data misuse.

---

[16] John Krebs, *The dark web: What your business needs to know*, FED. TRADE COMM. (Oct. 17, 2017) https://www.ftc.gov/business-guidance/blog/2017/10/dark-web-what-your-business-needs-know.

19. Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, and/or negligently failing to take and implement adequate and reasonable measures to ensure that the Private Information of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, Plaintiffs' and Class Members' Private Information was compromised through disclosure to an unknown and unauthorized criminal third party.

20. By aggregating information obtained from the Data Breach with other sources or other methods, criminals can assemble a full dossier of private information on an individual to facilitate a wide variety of frauds, thefts, and scams. Criminals can and do use victims' names and other personal information to open new financial accounts, incur credit charges, obtain government benefits and identifications, fabricate identities, and file fraudulent tax returns well before the person whose Private Information was stolen becomes aware of it. Any one of these instances of identity theft can have devastating consequences for the victim, causing years of often irreversible damage to their credit scores, financial stability, and personal security. This is an especially significant concern here, as the responsible cybercriminals were able to extract "candidate profiles" from Mercor's system which contain not only their Social Security numbers and payment information, but also work product and other data such as interview footage that can be used to attempt to imitate or defraud Plaintiffs and the Class.

21. Upon information and belief, cybercriminals were able to breach Defendant's systems because Defendant breached its duties and obligations in one or more of the following ways: (i) failing to design or being negligent in the design, implementation, monitoring, and maintaining reasonable network safeguards

against foreseeable threats; (ii) failing to design, implement, and maintain reasonable data retention policies; (iii) failing to adequately train staff on data security; (iv) failing to comply with industry-standard data security practices; (v) failing to warn Plaintiffs and Class Members of Defendant's inadequate data security practices; (vi) failing to encrypt or adequately encrypt the Private Information; (vii) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (viii) failing to utilize widely available software able to detect and prevent this type of attack; and (iv) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents. These failures rendered Mercor an easy target for cybercriminals.

22. In failing to adequately protect Plaintiffs' and the Class's Private Information or adequately notify them about the Data Breach, and by obfuscating the nature of the Data Breach, Defendant violated federal and state law and harmed a staggering number of people.

23. The exposure of one's Private Information to cybercriminals is a bell that cannot be unrung. Before the Data Breach, the Private Information of Plaintiffs and the Class was exactly that—private. No longer. Now, their Private Information is permanently exposed and unsecure and Plaintiffs and Class Members will have to monitor their accounts for signs of identity theft and fraud for the remainder of their lives.

## **PARTIES**

24. Plaintiff Christof Deboni is a citizen and resident of Pennsylvania, where he intends to remain.

25. Plaintiff NaTivia Esson is a citizen and current resident of Missouri. She intends to move in or around July 2026 to Tennessee (where she intends to remain thereafter).

26. Plaintiff Lisa Gill is a citizen and resident of Hawaii, where she intends to remain.

27. Plaintiff Tyler Housley is a citizen and resident of Utah, where he intends to remain.

28. Plaintiff Jelani Lofton is a citizen and resident of Georgia, where he intends to remain.

29. Plaintiff Elana Ramos is a citizen and resident of Florida, where she intends to remain.

30. Plaintiff Craig Smith is a citizen and resident of California, where he intends to remain.

31. Plaintiff Joanna Smithback is a citizen and resident of Ohio, where she intends to remain.

32. Plaintiff Vineeth Ananthula is a citizen and resident of Texas, where he intends to remain.

33. Defendant is a corporation organized under the laws of the State of Delaware with its principal place of business located at 181 Fremont Street, 33rd Floor, San Francisco, California, 94105.

## JURISDICTION & VENUE

34. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendant. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

35. For purposes of assessing diversity under 28 U.S.C.§ 1332(c)(1), a corporation is "a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." 28 U.S.C.§ 1332(c)(1).

36. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in California and regularly conducts business in California.

37. Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### Defendant Mercor.IO

38. Mercor is an American artificial intelligence hiring startup that provides experts to research labs to train AI models and chatbots.[17] Mercor advertises itself as "find[ing] the best experts in every professional domain and put[ting] their knowledge to work training frontier models."[18]

39. As part of its services, Defendant operates a platform that "build[s] the layer between human expertise and frontier models" by connecting domain experts with AI research labs for the purposes of refining AI models.[19] In essence, Defendant operates as a staffing clearinghouse or job board connecting job seekers with companies seeking contract employees. In doing so, Defendant acts as a middleman, collecting and storing the Private Information of its contractors to facilitate their employment and to provide payment.

40. Defendant claims "it facilitates more than $2 million in daily payouts and was valued at $10 billion following a $350 million Series C round led by Felicis Ventures in October 2025."[20]

41. As part of its business, Defendant receives, collects, and maintains the

---

[17] *Mercor Mission*, Mercor, https://mercor.com/mission/
[18] *Id.*
[19] *Id.*
[20] Singh, *supra* note 10.

highly sensitive Private Information of its current and former clients, applicants, and employees. Mercor routinely collects contractors' and applicants' sensitive Private Information, such as resume or CV, interview video/audio and AI transcripts, written feedback from companies (if applicable), results of background checks (if authorized), email, login credentials, profile photo, location, work preferences, and compensation expectations, public profile information (*e.g.*, LinkedIn, GitHub), and offer, payment, and tax details (if provided).[21]

42. Mercor states that it uses the above data to "provide feedback and power job matches," conduct AI interviews, and recommend profiles to prospective employers.[22] The data is also used to train Mercor's internal recommendation models and improve the performance of Mercor's platform.[23]

43. Mercor also generates revenue by "appl[ying] a margin to companies' pay rates once you accept a role. This fee compensates us for sourcing, vetting, and placing candidates. In summary, we only generate revenue when you are successfully placed on a project. Our AI models are specifically designed to optimize the likelihood of matching you with suitable employment opportunities."[24]

44. It is thus clear from Mercor's own public statements that it generates revenue not only from successfully matching their clients and contractors with job opportunities, but also through the collection of Plaintiffs' and the Class's Private Information itself, which Mercor uses to improve its own models and services.

45. After collecting its clients' and contractors' Private Information, Defendant maintains the collected Private Information in its computer systems.

---

[21] *How Mercor Uses AI and Data*, MERCOR, https://talent.docs.mercor.com/policies/data-ai-usage.
[22] *Id.*
[23] *Id.*
[24] *Id.*

46. In collecting and maintaining its contractors' and clients' Private Information, Defendant agreed it would safeguard the data in accordance with its internal policies as well as state law and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their Private Information.

47. Indeed, Defendant understood the importance of adequate cybersecurity measures, declaring in its Privacy Policy: "[a]t Mercor, we are committed to protecting the privacy and security of your personal information."[25]

48. The Privacy Policy also provides: "[w]e implement appropriate technical and organizational measures to protect your personal data against: unauthorized access, alteration, or disclosure; accidental loss or destruction; and data breaches and cyber attacks."[26]

49. The Privacy Policy further makes assurances that Private Information will be maintained by Mercor only as long as necessary to provide its services and that redundant data will be securely deleted or anonymized.[27]

50. As part of this obligation, the Privacy Policy also states Defendant will only share consumer information for business and legal purposes.[28]

51. Defendant understood the need to protect Private Information and prioritize its data security. However, Defendant failed to meet its obligations.

52. Despite recognizing its duty to do so, on information and belief, Defendant has not implemented reasonable cybersecurity safeguards or policies to protect Private Information in its possession or adequately trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, Defendant leaves significant vulnerabilities in its systems for cybercriminals to

---

[25] *Privacy Policy*, MERCOR, https://www.mercor.com/data-privacy-policy/.
[26] *Id.*
[27] *Id.*
[28] *Id.*

exploit and gain access to Plaintiffs' and Class Members' Private Information.

***The Data Breach***

53.    The Data Breach began on or around March 24, 2026, when Lapsus$ and TeamPCP infiltrated the computer network of Mercor.[29]

54.    During the Data Breach, Lapsus$ and TeamPCP acquired "4 terabytes of stolen data: 939 GB of platform source code, a 211 GB user database, approximately 3 TB of video interview recordings and identity verification documents, internal Slack communications, ticketing data, TailScale VPN configurations, and contractor PII including Social Security numbers."[30]

55.    On March 31, 2026, Mercor confirmed the Data Breach—reporting that it was connected to a supply chain attack involving the open-source LiteLLM project.[31] In layman's terms, LiteLLM is an open-source software companies use to store API Keys and other access tools. It advertises itself as an "Open Source AI Gateway for 100+ LLMs."[32]

56.    Mercor in turn uses LiteLLM to integrate its platform with a series of artificial intelligence platforms and LiteLLM essentially served as a middle layer between Mercor and various AI platforms that Mercor used to effect its services.

57.    Threat actors were able to compromise LiteLLM to insert malicious software which in turn was uploaded by Mercor through its use of LiteLLM.

58.    The malicious code uploaded by the threat actor was live for between 40 minutes and 3 hours, in which time the threat actors, TeamPCP and Lapsus$, were able to export 4 terabytes of information—including files containing the Private Information of Plaintiffs and the Class:

---

[29] *See* Beals, *supra* note 7.
[30] *Id*.
[31] *See* Singh, *supra* note 10.
[32] *See BerriAI / Litellm*, GITHUB, https://github.com/BerriAI/litellm.

> When Mercor's systems ingested the malicious LiteLLM versions, the credential-harvesting malware executed and stole API keys, cloud credentials, SSH keys, database passwords, and Kubernetes configs. Using these stolen credentials, attackers moved laterally through Mercor's infrastructure. The extortion group Lapsus$, collaborating with TeamPCP, subsequently claimed 4 terabytes of stolen data: 939 GB of platform source code, a 211 GB user database, approximately 3 TB of video interview recordings and identity verification documents, internal Slack communications, ticketing data, TailScale VPN configurations, and **contractor PII including Social Security numbers.**[33]

59. On or around March 31, 2026, Lapsus$ then launched a "LIVE AUCTION" on the Dark Web to sell the stolen four terabytes of data to other nefarious actors and cybercriminals.[34]

60. In other words, Lapsus$ auctioned the Private Information of Plaintiffs and Class Members on the Dark Web.[35]

61. Worryingly, the Dark Web auction included a hyperlink beginning with "https://pastebin.com" which enabled other nefarious actors and cybercriminals to access and download data stolen from Mercor.[36] On information and belief, the "https://pastebin.com" hyperlink enabled cybercriminals to access—and then download—the Private Information of Plaintiffs and Class Members.

---

[33] *See* Beals, *supra* note 7.
[34] *See* Arghire, *supra* note 12.
[35] *Id*.
[36] *Id*.

14

62. A screenshot of the Dark Web auction is provided below.[37] However, the end of the "https://pastebin.com" hyperlink has been redacted to avoid further dissemination of the stolen data.



63. On information and belief, Lapsus$ has already sold—or imminently will sell—the Private Information of Plaintiffs and Class Members via its "LIVE AUCTION" on the Dark Web.

64. Mercor's cyber and data security systems were completely inadequate and allowed cybercriminals unfettered to access files containing a treasure trove of Plaintiffs' and the Class's Private Information. Moreover, the access point utilized by the threat actor here was connected to a publicly facing internet tool evidently accessible to anyone with an internet connection.

65. Mercor could have prevented this Data Breach by implementing more robust security controls and auditing the code of LiteLLM before integrating it with

---

[37] *Id*.

its platform, monitoring for suspicious package activity, performing penetration tests and using software composition analysis tools to identify malicious code being introduced to its network environment. Mercor should also have limited access to its environment from integrated services, required multi-factor authentication to access areas of its network on which Private Information or other sensitive information was stored, encrypted Private Information at rest and in transit, used time limited credentials rather than API access, regularly rotated access credentials, and monitored their network for unusual activity and the transfer of large volumes of data to third party networks. These are all expected and industry standard data security measures.

66.    Despite its duties and alleged commitments to safeguard Private Information, Defendant did not in fact follow industry standard practices or comply with federal and state law in securing Plaintiffs' and Class Members' Private Information, as evidenced by the Data Breach.

67.    Defendant failed to adequately train and supervise its IT and data security agents and employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over Plaintiffs' and Class Members' Private Information. Further, Defendant maintained sensitive client and employee information in a manner which was accessible using the public facing internet. Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the Private Information.

68.    For example, as evidenced by the Data Breach's occurrence, the infiltrated network was not protected by sufficient multi-layer data security technologies or effective firewalls.

69.    Similarly, based on the delayed discovery of the Data Breach, it is evident that the infiltrated network, that Defendant allowed to store Plaintiffs' Private Information, did not have sufficiently effective endpoint detection.

70. Despite the scope of the Data Breach and the sensitivity of the Private Information involved, Mercor has not issued notice to affected parties beyond an initial email notice on March 31, 2026, which contained no information regarding the type of information taken in the Data Breach or its mechanism.

71. The Identity Theft Research Center's 2024 Annual Data Breach Report notes that, "approximately 70 percent of cyberattack-related breach notices did not include attack information, compared to 58 percent in 2023. In 2019 and previous years, ~100 percent of breach notices included attack vector information." Eva Velasquez, CEO of the Identity Theft Resource Center, remarked that "[w]ith a near-record number of compromises and over 1.3 billion victim notices, often tied to inadequate cyber practices, we are also seeing an increase in notices that provide limited actionable information for victims."[38]

72. Plaintiffs and Class Members entrusted Defendant with their Private Information which includes information (such as Social Security numbers) that is static, does not change, and can be used to commit a myriad of financial crimes.

73. The risk of identity theft and unauthorized use of Plaintiffs' and Class Members' Private Information is substantially high. The Private Information will remain on the Dark Web for years, and thus the fraudulent activity resulting from the Data Breach may not come to light for years.

74. Cybercriminals do not need to have harvested every piece of an individual's Private Information in order to commit identity fraud or misuse Plaintiffs' and the Class's Private Information. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create

---

[38] Identity Theft Resource Center, *2024 Annual Data Breach Report Reveals Near-Record Number of Compromises and Victim Notices*, ITRC (Jan. 28, 2025), available at https://www.idtheftcenter.org/post/2024-annual-data-breach-report-near-record-compromises/.

"Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff's and the Class's financial accounts.

75. A sophisticated black market exists on the Dark Web where criminals can buy or sell malware, firearms, drugs, and frequently, stolen Private Information like the Private Information at issue here. The digital character of Private Information stolen in data breaches lends itself to Dark Web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.

76. As the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[39]

77. For example, when the U.S. Department of Justice announced their seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity."[40] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [PII] belonging to victims from countries all over the world."[41]

---

[39] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023). https://hbr.org/2023/01/your-companys-data-is-for-sale-on-the-dark-web-should-you-buy-it-back.

[40] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/.

[41] *Id.*

78.    On information and belief, Plaintiffs' and the Class Members' stolen Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

***Defendant's Data Breach was Preventable***

79.    Data breaches are preventable.[42] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[43] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[44]

80.    "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures . . . Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[45]

81.    Data security breaches have dominated the headlines for the last two decades. And it doesn't take an IT industry expert to know it. The general public can tell you the names of some of the biggest cybersecurity breaches: Target,[46]

---

[42]Lucy L. Thompson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012)

[43]*Id.* at 17.

[44]*Id.* at 28.

[45]*Id.*

[46] Michael Kassner, *Anatomy of the Target Data Breach: Missed Opportunities and Lessons Learned*, ZDNET (Feb. 2, 2015), https://www.zdnet.com/article/anatomy-of-the-target-data-breach-missed-opportunities-and-lessons-learned/.

Yahoo,[47] Marriott International,[48] Chipotle, Chili's, Arby's,[49] and others.[50]

82.    In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[51]

83.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[52]

84.    "Several attacks have affected HR recruiting operations in recent years.

---

[47] Martyn Williams, *Inside the Russian Hack of Yahoo: How They Did It*, CSOONLINE.COM (Oct. 4, 2017), https://www.csoonline.com/article/3180762/inside-the-russian-hack-of-yahoo-how-they-did-it.html/.

[48] Patrick Nohe, *The Marriott Data Breach: Full Autopsy*, THE SSL STORE: HASHEDOUT (Mar. 22, 2019), https://www.thesslstore.com/blog/autopsying-the-marriott-data-breach-this-is-why-insurance-matters/.

[49] Alfred Ng, *FBI Nabs Alleged Hackers in Theft of 15M Credit Cards from Chipotle, Others*, CNET (Aug. 1, 2018), https://www.cnet.com/news/fbi-nabs-alleged-hackers-in-theft-of-15m-credit-cards-from-chipotle-others/?ftag=CMG-01-10aaa1b/.

[50] *See, e.g.*, Taylor Armerding, *The 18 Biggest Data Breaches of the 21st Century*, CSO ONLINE (Dec. 20, 2018), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html/.

[51] ZDNET, Ransomware mentioned in 1,000+ SEC filings over the past year (Apr. 30, 2020) (emphasis added)https://www.zdnet.com/article/ransomware-mentioned-in-1000- sec-filings-over-the-past-year/.

[52] U.S. CISA, Ransomware Guide – September 2020, available at https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C.pdf.

20

Background screening services provider DISA Global Solutions, Inc. disclosed a breach in early 2025 affecting more than 3.3 million users. And last August, a breach of a Michigan ManpowerGroup franchise potentially exposed the personal information of 145,000 customers."[53]

85.   Lapsus$ and their methodologies are similarly well known. In recent years, Lapsus$ has been responsible for breaches at other significant tech companies including: Uber, Rockstar, Microsoft, Nvidia, Okta, Samsung, and Ubisoft.[54]

86.   "TeamPCP (aka PCPcat, ShellForce, DeadCatx3) has conducted operations dating back to at least September 2025 [and] gained notoriety in December 2025, in the wake of the massive React2Shell campaign that targeted cloud environments."[55]

87.   "TeamPCP is known for engineering so-called supply-chain attacks [like the one here], in which malware is planted inside codebases or software libraries that are widely used by programmers when writing their own code."[56]

88.   In the years immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for

---

[53] Ryan Golden, *AI industry recruiting platform faces multiple lawsuits over data breach*, HR DIVE (APR. 13, 2026), https://www.hrdive.com/news/ai-industry-recruiting-platform-faces-multiplelawsuits-data-breach/817319/.

[54] *See* Lily Hay Newman, *The Dire Warnings in the Lapsus$ Hacker Joyride*, WIRED (SEPT. 27, 2026), https://www.wired.com/story/lapsusdollar-uber-rockstar-breach-multifactor-authentication-weaknesses/.

[55] *Weaponizing the Protectors: TeamPCP's Multi-Stage Supply Chain Attack on Security Infrastructure*, PALO ALTO NETWORKS (Apr. 9, 2026), https://unit42.paloaltonetworks.com/teampcp-supply-chain-attacks/.

[56] Beatrice Nolan, *Mercor, a $10 billion AI startup that works with companies including OpenAI and Anthropic, confirms major data breach*, FORTUNE (APR.. 2, 2026), https://fortune.com/2026/04/02/mercor-ai-startup-security-incident-10-billion/.

21

cybersecurity attacks because warnings were readily available and accessible, including in numerous news reports and internet postings. Further, Defendant should have been aware of the high likelihood of supply chain attacks, like the one employed in the Data Breach, and taken precautions to guard against them.

89. In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. The estimated number of organizations impacted by data compromises has increased by +2,600 percentage points since 2018, and the estimated number of victims has increased by +1400 percentage points. The 2023 compromises represent a 78-percentage point increase over the previous year and a 72-percentage point hike from the previous all-time high number of compromises (1,860) set in 2021.

90. 2024 was even worse for data breaches. While the total number of compromises fell 44 events short of the 2023 all-time high, the number of total victims increased to a staggering 1,350,835,988 victims, a 211% increase year over year.[57] Notably, 142 of these compromises affected companies in the technology industry.[58]

91. This trend has not slowed. The United States saw a new record of 3,322 data compromises in 2025; a massive 79 percent (79%) jump over five years.[59]

92. This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that: (i) cybercriminals were targeting entities such as Defendant that stored large volumes of Private

---

[57] *ITRC 2024 Annual Data Breach Report*, IDENTITY THEFT RES. CTR. (Jan. 28, 2025), https://www.idtheftcenter.org/publication/2024-data-breach-report/.
[58] *Id.*
[59] *2025 End of Year Data Breach Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf.

Information, (ii) cybercriminals were ferociously aggressive in their pursuit of companies in possession of significant sensitive information such as Defendant, (iii) cybercriminals were leaking corporate information on Dark Web portals, and (iv) cybercriminals' tactics included threatening to release stolen data.

93. Prior to the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' Private Information could be accessed, exfiltrated, and published as the result of a cyberattack. This is particularly true since Defendant elected to maintain sensitive Private Information belonging to Plaintiffs and the Class in a portal which was open to access from the public internet.

94. Defendant should certainly have been aware, and indeed was aware, that it was at risk for a data breach that could expose the Private Information that it collected and maintained.

95. Defendant was also on notice of the importance of data encryption of Private Information. Defendant knew it kept Private Information in its systems and yet it appears Defendant did not encrypt these systems or the information contained within them.

### *Defendant Failed to Comply with FTC Guidelines*

96. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

97. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[60] The FTC describes "identifying information" as "any name or number that may be used,

---

[60] 17 C.F.R. § 248.201 (2013).

alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[61]

98. In 2016, the FTC updated its publication, *Protecting Private Information: A Guide for Business*, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of Private Information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[62]

99. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[63]

100. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security

---

[61] *Id.*

[62] *Protecting Private Information: A Guide for Business*, FEDERAL TRADE COMMISSION (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

[63] *Id.*

measures.

101. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

102. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

103. Defendant failed to properly implement these basic data security practices.

104. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' and contractors' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

105. Upon information and belief, Defendant was at all times fully aware of its obligation to protect the Private Information of consumers and contractors; Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class if it were stolen.

*Defendant Owed Plaintiffs and Class Members a Duty Under Industry Standards and Applicable Law to Safeguard their Private Information*

106. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, viewed and misused by unauthorized persons. Defendant owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

107. Defendant owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

108. Several best practices have been identified that at a minimum should be implemented by large entities like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

109. Other best cybersecurity practices that are considered industry-standard include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible

26

communication system; training staff regarding critical points.

110. Upon information and belief, Defendant failed to meet the minimum standards of any of the following frameworks: NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

111. These foregoing frameworks exist as applicable industry standards, particularly for large financial entities. Defendant, however, failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

112. The mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take necessary steps to secure Plaintiffs' and Class Members' Private Information from those risks left that information in a dangerous condition.

113. Defendant disregarded its duties and the rights of Plaintiffs and Class Members by, *inter alia*: (i) recklessly and/or negligently failing to take adequate and reasonable measures to ensure that its business email accounts were protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiffs' and Class Members' Private Information; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

114. Defendant owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

115. Defendant owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

116. Defendant owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

117. Defendant owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

***Value of Personally Identifiable Information***

118. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the Dark Web. Numerous sources cite Dark Web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[64] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the Dark Web.[65] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[66]

119. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card

[64] *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[65] *Here's How Much Your Personal Information Is Selling for on the Dark Web,* EXPERIAN, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[66] *In the Dark,* VPNOVERVIEW (2019), https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

120. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[67]

121. Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

122. At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, including Social Security Numbers, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

123. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and the Class are incurring, and will continue to incur, such damages in addition to any fraudulent use of their Private Information.

124. Defendant was, or should have been, fully aware of the unique type and the significant volume of data contained in Defendant's computer systems, amounting to potentially tens of thousands of individuals' detailed, personal

---

[67] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

125. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

***The Data Breach Increases Plaintiffs' and Class Members' Risk of Identity Theft***

126. On information and belief, the unencrypted Private Information of Plaintiffs and Class Members has already been made publicly available on the Dark Web.

127. Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs and Class Members.

128. Simply put, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members because of the Data Breach.

129. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

130. Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[68] For example, with the Private Information stolen in the Data Breach, identity thieves can open financial accounts, apply for credit,

---

[68]"Facts + Statistics: Identity Theft and Cybercrime," INSURANCE INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").

collect government benefits, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[69] These criminal activities have resulted and will result in devastating financial and personal losses to Plaintiffs and Class Members.

131. Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.[70]

132. This was a financially motivated Data Breach, as apparent from the discovery of the cyber criminals seeking to profit from the sale of Plaintiffs' and the Class Members' Private Information on the Dark Web. The Private Information exposed in this Data Breach is valuable to identity thieves for use in the kinds of criminal activity described herein. In fact, Plaintiffs have already suffered a significant amount of financial fraud.

133. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to personally identifiable information, they will use it.[71]

134. Due to the risk of one's Social Security number being exposed, state legislatures have passed laws in recognition of the risk: "[t]he social security

---

[69] John Egan, *What Should I Do if My Driver's License Number Is Stolen?*, EXPERIAN (JUN. 13, 2024), https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/.

[70] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/products/gao-07-737.

[71] Ari Lazarus, *How fast will identity thieves use stolen info?*, FED. TRADE COMM'N (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

31

number can be used as a tool to perpetuate fraud against a person and to acquire sensitive personal, financial, medical, and familial information, the release of which could cause great financial or personal harm to an individual. While the social security number was intended to be used solely for the administration of the federal Social Security System, over time this unique numeric identifier has been used extensively for identity verification purposes[.]"[72]

135. Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit off their misfortune.

136. Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective patients."[73]

137. "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a patient's identity after the initial account setup[.]"[74] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank

---

[72] *See* N.C. Gen. Stat. § 132-1.10(1).

[73] *See* Husayn Kassai, Banks need to stop relying on Social Security numbers, AM. BANKER (Nov. 12, 2018), https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers.

[74] *See* Ann Carrns, *Just 5 Banks Prohibit Use of Social Security Numbers*, N.Y. TIMES (Mar. 20, 2013), https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/.

account."[75]

138. Each year, identity theft causes billions of dollars of losses to victims in the United States.[76] For example, with the Private Information stolen in the Data Breach, identity thieves can open financial accounts, apply for credit, collect government benefits, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[77] These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and Class Members.

139. Private Information is such a valuable commodity to identity thieves that once it has been compromised, criminals will use it and trade the information on the cyber black-market for years.[78] This stolen Private Information is then routinely traded on Dark Web black markets as a simple commodity.[79]

140. This is particularly true, as is the case in the Data Breach here, when cybercriminals are able to access an individual's Social Security number. A compromised Social Security number can give criminals and other unsavory groups the ability to fraudulently take out loans under the victims' name, open new lines

[75] *See What Can Someone Do With Your Social Security Number?*, CREDIT.COM (OCT. 19, 2023), https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/.

[76] *Facts + Statistics: Identity Theft and Cybercrime*, INSURANCE INFO. INST., https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime.

[77] John Egan*, What Should I Do if My Driver's License Number is Stolen*, EXPERIAN (June 13, 2024), https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/.

[78] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/products/gao-07-737.

[79] Edvardas Mikalauskas, *What is your identity worth on the dark web?* CYBERNEWS (September 28, 2021), https://cybernews.com/security/whats-your-identity-worth-on-dark-web/.

of credit, and cause other serious financial difficulties for victims:

> [a] dishonest person who has your Social Security number can use it to get other Private Information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[80]

141. According to data security experts, one out of every four data breach notification recipients become a victim of identity fraud.[81]

142. Furthermore, the Private Information involved has a long shelf life because it contains a variety of data points, it can be used in more ways than one, and it typically takes time for an information breach to be detected.

143. Hackers may not use the accessed information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data

---

[80] UNITED STATES SOCIAL SECURITY ADMINISTRATION, *Identity Theft and Your Social Security Number* (July 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.
[81] *Press Release,* JAVELIN STRATEGY & RESEARCH (Feb. 20, 2013), https://javelinstrategy.com/press-release/more-12-million-identity-fraud-victims-2012-according-latest-javelin-strategy-research.

breaches cannot necessarily rule out all future harm.[82]

144. As described above, identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit.[83]

145. With this Data Breach, identity thieves have already started to prey on the victims, including Plaintiffs, and one can reasonably anticipate this will continue.

146. One such example of criminals using Private Information for profit is the development of "Fullz" packages.[84]

147. Cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

---

[82] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO, July 5, 2007, https://www.gao.gov/products/gao-07-737.

[83] "Guide for Assisting Identity Theft Victims," FEDERAL TRADE COMMISSION, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

[84] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm/ .

35

148. The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and the Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

149. Victims of the Data Breach, like Plaintiffs and other Class Members, must spend many hours and large amounts of money protecting themselves from the current and future negative impacts to their credit because of the Data Breach.[85]

150. In fact, as a direct and proximate result of the Data Breach, Plaintiffs and the Class have suffered, and have been placed at an imminent, immediate, and continuing increased risk of suffering harm from fraud and identity theft. Plaintiffs and the Class must now take the time and effort and spend the money to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and other personal accounts for unauthorized activity for years to come.

151. There is also a high likelihood that significant identity fraud and/or identity theft has not yet been discovered or reported. Even data that has not yet been exploited by cybercriminals presents a concrete risk that the cybercriminals

---

[85] "Guide for Assisting Identity Theft Victims," FEDERAL TRADE COMMISSION, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

who now possess Class Members' Private Information will do so at a later date or resell it.

### Plaintiffs' Mitigation Efforts

152. As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

153. Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

154. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as changing passwords and resecuring their own computer systems.

155. Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[86]

156. Plaintiffs' mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to

---

[86] *See* UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

37

place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[87]

157. Due to the nonfungible nature of the information compromised in this Data Breach (e.g., names and Social Security numbers), limited scope credit monitoring is a woefully inadequate solution to the imminent and ongoing threat of identity theft faced by Plaintiffs and the Class.

### *Diminution of Value of Private Information*

158. Private Information is valuable property.[88] Its value is axiomatic, considering the value of big data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information has considerable market value.

159. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[89]

160. An active and robust legitimate marketplace for Private Information

---

[87] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps.

[88] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. GOVERNMENT ACCOUNTABILITY OFFICE, June 2007, https://www.gao.gov/new.items/d07737.pdf (GAO Report).

[89] *See, e.g.*, John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

also exists. In 2019, the data brokering industry was worth roughly $200 billion.[90] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[91,92]

161. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.[93]

162. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

163. The fraudulent activity resulting from the Data Breach may not come to light for years.

164. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

165. Defendant was, or should have been, fully aware of the unique type and

[90] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.
[91] David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, L.A. TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.
[92] DATACOUP, INC., https://datacoup.com/.
[93] https://digitalpanel.nielsen.com/ui/US/en/sdp/landing?SourceId=698&PID=join%20the,software%20installed%20on%20your%20computer.

the significant volume of data on Defendant's network, amounting to tens of thousands of individuals' detailed Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

### Lost Benefit of the Bargain

166. Furthermore, Defendant's poor data security practices deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to allow Defendant to monetize their data or to give Defendant a portion of the payments they received for work, Plaintiffs and other reasonable consumers understood and expected that they were, in part, paying for the product and/or service and necessary data security to protect the Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

167. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

### The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary

168. As discussed, *supra*, the stolen data compromised in this Data Breach was already placed on the black market/Dark Web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.,* opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

169. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private

Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

170. Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

171. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft resulting from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear, but for Defendant's failure to safeguard their Private Information.

**PLAINTIFFS' INDIVIDUAL EXPERIENCES AND INJURIES**

*Plaintiff Christof Deboni*

172. On or about March 31, 2026, Plaintiff Deboni received a Notice via email from Defendant informing him that his Private Information had been compromised as part of the Data Breach.

173. Defendant obtained Plaintiff's information during Plaintiff Deboni's employment with Defendant and through the onboarding process. Plaintiff Deboni would not have entrusted his Private Information to Defendant had he known of Defendant's lax data security policies.

174. Plaintiff Deboni is very careful about sharing his Private Information. Plaintiff Deboni always makes a point to store any documents containing his Private Information in a safe and secure location. For instance, Plaintiff Deboni does not knowingly transmit unencrypted Private Information over the internet and always shreds financial documents.

41

175. Plaintiff Deboni only provided his Private Information to Defendant because he understood that Defendant would take reasonable measures to protect it, consistent with state and federal law and industry standards.

176. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Deboni's Private Information to theft by cybercriminals.

177. On information and belief, Plaintiff Deboni's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

178. Plaintiff Deboni has suffered actual injury from the exposure and theft of his Private Information—which violates his right to privacy.

179. Plaintiff Deboni also suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

180. As a result of the Data Breach, Plaintiff Deboni has spent time and made reasonable efforts to mitigate the impact of the Data Breach including, but not limited to, researching the Data Breach, inquiring about the Data Breach, and monitoring credit card and financial accounts for fraudulent or suspicious activity. Plaintiff Deboni estimates that he has spent approximately eight (8) hours to date mitigating the impact of the Data Breach.

181. As a result of the Data Breach, Plaintiff Deboni has experienced stress, anxiety, and concern due to the loss of privacy and impact of cybercriminals accessing and misusing his Private Information. Plaintiff Deboni understandably fears that criminals will use his Private Information to commit identity theft.

182. Defendant deprived Plaintiff Deboni of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach.

42

183. Plaintiff Deboni is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Deboni about the Data Breach in a timely fashion.

184. On information and belief, Plaintiff Deboni's phone number and email were compromised as a result of the Data Breach. Indeed, following the Data Breach, Plaintiff Deboni began suffering a significant increase in spam and phishing calls, text messages, and emails. These spam and phishing calls, texts, and emails suggest that his Private Information is now in the hands of cybercriminals.

185. Plaintiff Deboni has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

186. Plaintiff Deboni has suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Deboni's valuable Private Information; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff Deboni's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Deboni's Private Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant at the cost to Plaintiff Deboni, including the difference in value between the protection Plaintiff Deboni's Private Information should have received from Defendant and the defective and deficient protection that Defendant actually provided; (e) lost time spent in response to the Data Breach reviewing various accounts and financial information to detect potential fraud and ID theft; and (f) continued risk to Plaintiff Deboni's Private Information, which remains in the possession of Defendant and will remain vulnerable to further breaches so long as Defendant fails to take appropriate and adequate measures to protect it.

***Plaintiff NaTivia Esson***

43

187. On March 31, 2026, Plaintiff Esson received a Notice via email from Defendant informing her that her Private Information had been compromised as part of the Data Breach.

188. As an account holder and independent contractor with Defendant, Plaintiff Esson was required to provide Defendant with her Private Information. To the best of Plaintiff Esson's present recollection, this information included her full legal name, email address, phone number, mailing address, and Social Security number. Plaintiff Esson would not have entrusted her Private Information to Defendant had she known of Defendant's lax data security policies.

189. Plaintiff Esson is very careful about sharing her Private Information. She does not knowingly transmit her Private Information over the internet in an unsafe manner.

190. Plaintiff Esson only provided her Private Information to Defendant because she understood that Defendant would take reasonable measures to protect it, consistent with state and federal law and industry standards.

191. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Esson's Private Information to theft by cybercriminals.

192. On information and belief, Plaintiff Esson's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

193. Plaintiff Esson has suffered actual injury from the exposure and theft of her Private Information—which violates her right to privacy.

194. Plaintiff Esson also suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

44

195. As a result of the Data Breach, Plaintiff Esson has spent time and made reasonable efforts to mitigate the impact of the Data Breach including, but not limited to, monitoring credit card and financial accounts for fraudulent or suspicious activity, changing account access credentials, log ins, and passwords, and researching the Data Breach. Plaintiff Esson estimates that she has spent approximately an hour to date mitigating the impact of the Data Breach.

196. As a result of the Data Breach, Plaintiff Esson has experienced stress and anxiety due to the loss of privacy and impact of cybercriminals accessing and misusing her Private Information. Plaintiff Esson understandably fears that criminals will use her Private Information to commit identity theft.

197. Defendant deprived Plaintiff Esson of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her about the Data Breach.

198. Plaintiff Esson is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Esson about the Data Breach in a timely fashion.

199. On information and belief, Plaintiff Esson's phone number and email were compromised as a result of the Data Breach. Indeed, following the Data Breach, Plaintiff Esson began suffering a significant increase in spam and phishing calls, text messages, and emails. These spam and phishing calls, texts, and emails suggest that her Private Information is now in the hands of cybercriminals.

200. Plaintiff Esson has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

201. Plaintiff Esson has suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Esson's valuable Private

45

Information; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff Esson's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Esson's Private Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant at the cost to Plaintiff Esson, including the difference in value between the protection Plaintiff Esson's Private Information should have received from Defendant and the defective and deficient protection that Defendant actually provided; (e) lost time spent in response to the Data Breach reviewing various accounts and financial information to detect potential fraud and ID theft; and (f) continued risk to Plaintiff Esson's Private Information, which remains in the possession of Defendant and will remain vulnerable to further breaches so long as Defendant fails to take appropriate and adequate measures to protect it.

***Plaintiff Lisa Ayn Gill***

202.   On or about March 31, 2026, Plaintiff Gill received a Notice via email from Defendant informing her that her Private Information had been compromised as part of the Data Breach.

203.   Defendant obtained Plaintiff Gill's information during Plaintiff's employment with Defendant and through the onboarding process. Plaintiff Gill would not have entrusted her Private Information to Defendant had she known of Defendant's lax data security policies.

204.   Plaintiff Gill is very careful about sharing her Private Information. Plaintiff Gill always makes a point to store any documents containing her Private Information in a safe and secure location. For instance, Plaintiff Gill does not knowingly transmit unencrypted Private Information over the internet and always shreds financial documents.

205. Plaintiff Gill only provided her Private Information to Defendant because she understood that Defendant would take reasonable measures to protect it, consistent with state and federal law and industry standards.

206. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Gill's Private Information to theft by cybercriminals.

207. On information and belief, Plaintiff Gill's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

208. Plaintiff Gill has suffered actual injury from the exposure and theft of her Private Information—which violates her right to privacy.

209. Plaintiff Gill also suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

210. As a result of the Data Breach, Plaintiff Gill has spent time and made reasonable efforts to mitigate the impact of the Data Breach including, but not limited to, researching the Data Breach, inquiring about the Data Breach, and monitoring credit card and financial accounts for fraudulent or suspicious activity. Plaintiff Gill estimates that she has spent approximately eight (8) hours to date mitigating the impact of the Data Breach.

211. As a result of the Data Breach, Plaintiff Gill has experienced stress, anxiety, and concern due to the loss of privacy and impact of cybercriminals accessing and misusing her Private Information. Plaintiff Gill understandably fears that criminals will use her Private Information to commit identity theft.

212. Defendant deprived Plaintiff Gill of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her about the Data Breach.

213.    Plaintiff Gill is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Gill about the Data Breach in a timely fashion.

214.    On information and belief, Plaintiff Gill's phone number and email were compromised as a result of the Data Breach. Indeed, following the Data Breach, Plaintiff Gill began suffering a significant increase in spam and phishing calls, text messages, and emails. These spam and phishing calls, texts, and emails suggest that her Private Information is now in the hands of cybercriminals.

215.    Plaintiff Gill has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

216.    Plaintiff Gill has suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Gill's valuable Private Information; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff Gill's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Gill's Private Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant at the cost to Plaintiff Gill, including the difference in value between the protection Plaintiff Gill's Private Information should have received from Defendant and the defective and deficient protection that Defendant actually provided; (e) lost time spent in response to the Data Breach reviewing various accounts and financial information to detect potential fraud and ID theft; and (f) continued risk to Plaintiff Gill's Private Information, which remains in the possession of Defendant and will remain vulnerable to further breaches so long as Defendant fails to take appropriate and adequate measures to protect it.

*Plaintiff Tyler Housley*

217. On April 2, 2026, Plaintiff Housley received a Notice via email from Defendant informing him that his Private Information had been compromised as part of the Data Breach.

218. As a condition of his employment with Defendant, Plaintiff Housley provided Defendant with his Private Information. To the best of Plaintiff Housley's present recollection, this information included his full legal name, email address, phone number, mailing address, Social Security number, and tax and employment related information. Plaintiff Housley would not have entrusted his Private Information to Defendant had he known of Defendant's lax data security policies.

219. Plaintiff Housley is very careful about sharing his Private Information. He does not knowingly transmit his Private Information over the internet in an unsafe manner and he is careful to store any documents containing his Private Information in a secure location.

220. Plaintiff Housley only provided his Private Information to Defendant because he understood that Defendant would take reasonable measures to protect it, consistent with state and federal law and industry standards.

221. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Housley's Private Information to theft by cybercriminals.

222. On information and belief, Plaintiff Housley's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

223. Plaintiff Housley has suffered actual injury from the exposure and theft of his Private Information—which violates his right to privacy.

224. Plaintiff Housley also suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

225. As a result of the Data Breach, Plaintiff Housley has spent time and made reasonable efforts to mitigate the impact of the Data Breach including, but not limited to, monitoring credit card and financial accounts for fraudulent or suspicious activity, changing account access credentials, log ins, and passwords, and researching the Data Breach. Plaintiff Housley estimates that he has spent approximately two (2) hours to date mitigating the impact of the Data Breach.

226. As a result of the Data Breach, Plaintiff Housley has experienced stress and anxiety due to the loss of privacy and impact of cybercriminals accessing and misusing his Private Information. Plaintiff Housley understandably fears that criminals will use his Private Information to commit identity theft.

227. Defendant deprived Plaintiff Housley of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach.

228. Plaintiff Housley is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Housley about the Data Breach in a timely fashion.

229. On information and belief, Plaintiff Housley's phone number and email were compromised as a result of the Data Breach. Indeed, following the Data Breach, Plaintiff Housley began suffering a significant increase in spam and phishing calls, text messages, and emails. These spam and phishing calls, texts, and emails suggest that his Private Information is now in the hands of cybercriminals.

230. Plaintiff Housley has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

231. Plaintiff Housley has suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Housley's valuable Private

Information; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff Housley's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Housley's Private Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant at the cost to Plaintiff Housley, including the difference in value between the protection Plaintiff Housley's Private Information should have received from Defendant and the defective and deficient protection that Defendant actually provided; (e) lost time spent in response to the Data Breach reviewing various accounts and financial information to detect potential fraud and ID theft; and (f) continued risk to Plaintiff Housley's Private Information, which remains in the possession of Defendant and will remain vulnerable to further breaches so long as Defendant fails to take appropriate and adequate measures to protect it.

***Plaintiff Jelani Lofton***

232.  On or about March 31, 2026, Plaintiff Lofton received a Notice via email from Defendant informing him that his Private Information had been compromised as part of the Data Breach.

233. Plaintiff Lofton was a client of Defendant's and was required to provide Defendant with his Private Information as a condition of receiving services. Plaintiff Lofton would not have entrusted his Private Information to Defendant had he known of Defendant's lax data security policies.

234. Plaintiff Lofton is very careful about sharing his Private Information. Plaintiff always makes a point to store any documents containing his Private Information in a safe and secure location. For instance, Plaintiff does not knowingly transmit unencrypted Private Information over the internet.

51

235. Plaintiff Lofton only provided his Private Information to Defendant because he understood that Defendant would take reasonable measures to protect it, consistent with state and federal law and industry standards.

236. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Lofton's Private Information to theft by cybercriminals.

237. On information and belief, Plaintiff Lofton's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

238. Plaintiff Lofton has suffered actual injury from the exposure and theft of his Private Information—which violates his right to privacy.

239. Plaintiff Lofton also suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

240. As a result of the Data Breach, Plaintiff Lofton has spent time and made reasonable efforts to mitigate the impact of the Data Breach including, but not limited to, researching the breach, contacting lawyers to inquire about the breach, monitoring his accounts for suspicious activities, and contacting his bank about fraudulent activity. Plaintiff Lofton estimates that he has spent approximately three hours mitigating the impact of the Data Breach.

241. As a result of the Data Breach, Plaintiff Lofton has experienced stress, anxiety and concern due to the loss of privacy and impact of cybercriminals accessing and misusing his Private Information. Plaintiff Lofton understandably fears that criminals will use his Private Information to commit identity theft.

242. Defendant deprived Plaintiff Lofton of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach.

243. Plaintiff Lofton is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties. Plaintiff Lofton has experienced fraudulent attempted charges on his debit card after the Data Breach. This injury was worsened by Defendant's failure to inform Plaintiff Lofton about the Data Breach in a timely fashion.

244. On information and belief, Plaintiff Lofton's phone number was compromised as a result of the Data Breach. Indeed, following the Data Breach, Plaintiff Lofton began suffering a significant increase in spam phishing calls and text messages. These spam phishing calls and texts suggest that his Private Information is now in the hands of cybercriminals.

245. Plaintiff Lofton has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

246. Plaintiff Lofton has suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Lofton's valuable Private Information; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff Lofton's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Lofton's Private Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant at the cost to Plaintiff Lofton, including the difference in value between the protection Plaintiff Lofton's Private Information should have received from Defendant and the defective and deficient protection that Defendant actually provided; (e) lost time spent in response to the Data Breach reviewing various accounts and financial information to detect potential fraud and ID theft; and (f) continued risk to Plaintiff Lofton's Private Information, which remains in

the possession of Defendant and will remain vulnerable to further breaches so long as Defendant fails to take appropriate and adequate measures to protect it.

***Plaintiff Elana Ramos***

247. On or about March 31, 2026, Plaintiff Ramos received a Notice via email from Defendant informing her that her Private Information had been compromised as part of the Data Breach.

248. As an independent contractor with Defendant, Plaintiff was required to provide Defendant with her Private Information. Plaintiff Ramos would not have entrusted her Private Information to Defendant had she known of Defendant's lax data security policies. To the best of Plaintiff Ramos's present recollection, this information included her employment information, banking information, and Social Security number.

249. Plaintiff Ramos is very careful about sharing her Private Information. Plaintiff Ramos always makes a point to store any documents containing her Private Information in a safe and secure location. For instance, Plaintiff Ramos does not knowingly transmit unencrypted Private Information over the internet and always shreds financial documents.

250. Plaintiff Ramos only provided her Private Information to Defendant because she understood that Defendant would take reasonable measures to protect it, consistent with state and federal law and industry standards.

251. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Ramos's Private Information to theft by cybercriminals.

252. On information and belief, Plaintiff Ramos's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

54

253. In May 2026, an unauthorized individual attempted to open Xbox and streaming services accounts with her husband's card, which is linked to Plaintiff's PayPal account that was provided to Defendant.

254. Plaintiff Ramos has suffered actual injury from the exposure and theft of her Private Information—which violates her right to privacy.

255. Plaintiff Ramos also suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

256. As a result of the Data Breach, Plaintiff Ramos has spent time and made reasonable efforts to mitigate the impact of the Data Breach including, but not limited to, researching the Data Breach, inquiring about the Data Breach, and monitoring credit card and financial accounts for fraudulent or suspicious activity. Plaintiff Ramos estimates that she has spent approximately eight (8) hours to date mitigating the impact of the Data Breach.

257. As a result of the Data Breach, Plaintiff Ramos has experienced stress, anxiety, and concern due to the loss of privacy and impact of cybercriminals accessing and misusing her Private Information. Plaintiff Ramos understandably fears that criminals will use her Private Information to commit identity theft.

258. Defendant deprived Plaintiff Ramos of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her about the Data Breach.

259. Plaintiff Ramos is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Ramos about the Data Breach in a timely fashion.

260. Plaintiff Ramos has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

261. Plaintiff Ramos has suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Ramos's valuable Private Information; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff Ramos's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Ramos's Private Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant at the cost to Plaintiff Ramos, including the difference in value between the protection Plaintiff Ramos's Private Information should have received from Defendant and the defective and deficient protection that Defendant actually provided; (e) lost time spent in response to the Data Breach reviewing various accounts and financial information to detect potential fraud and ID theft; and (f) continued risk to Plaintiff Ramos's Private Information, which remains in the possession of Defendant and will remain vulnerable to further breaches so long as Defendant fails to take appropriate and adequate measures to protect it.

*Plaintiff Craig Smith*

262. On or about March 31, 2026, Plaintiff Smith received a Notice via email from Defendant informing him that his Private Information had been compromised as part of the Data Breach.

263. As an independent contractor with Defendant in January and February 2026, Plaintiff Smith was required to provide Defendant with his Private Information. Plaintiff Smith would not have entrusted his Private Information to Defendant had he known of Defendant's lax data security policies. To the best of Plaintiff Smith's present recollection, this information included his full legal name, signature, Stripe account information, email address, phone number, resume,

LinkedIn, education information, employment information, and Social Security number.

264. Plaintiff Smith is very careful about sharing his Private Information. Plaintiff Smith always makes a point to store any documents containing his Private Information in a safe and secure location. For instance, Plaintiff Smith does not knowingly transmit unencrypted Private Information over the internet and always shreds financial documents.

265. Plaintiff Smith only provided his Private Information to Defendant because he understood that Defendant would take reasonable measures to protect it, consistent with state and federal law and industry standards.

266. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Smith's Private Information to theft by cybercriminals.

267. On information and belief, Plaintiff Smith's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

268. Plaintiff Smith has suffered actual injury from the exposure and theft of his Private Information—which violates his right to privacy.

269. Plaintiff Smith also suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

270. As a result of the Data Breach, Plaintiff Smith has spent time and made reasonable efforts to mitigate the impact of the Data Breach including, but not limited to, researching the Data Breach, inquiring about the Data Breach, and monitoring credit card and financial accounts for fraudulent or suspicious activity. Plaintiff Smith estimates that he has spent approximately eight (8) hours to date mitigating the impact of the Data Breach.

271. As a result of the Data Breach, Plaintiff Smith has experienced stress, anxiety, and concern due to the loss of privacy and impact of cybercriminals accessing and misusing his Private Information. Plaintiff Smith understandably fears that criminals will use his Private Information to commit identity theft.

272. Defendant deprived Plaintiff Smith of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach.

273. Plaintiff Smith is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Smith about the Data Breach in a timely fashion.

274. On information and belief, Plaintiff Smith's phone number and email were compromised as a result of the Data Breach. Indeed, following the Data Breach, Plaintiff Smith began suffering a significant increase in spam and phishing calls, text messages, and emails. These spam and phishing calls, texts, and emails suggest that his Private Information is now in the hands of cybercriminals.

275. Plaintiff Smith has also observed an uptick in unauthorized attempts to access his Google and Microsoft accounts associated with his email address that he provided to Defendant.

276. On or around June 11, 2026, Plaintiff Smith received a call from a company in Nigeria claiming to be the principal investigator of the lab where he works and asked Plaintiff Smith to purchase Apple gift cards.

277. Plaintiff Smith has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

278. Plaintiff Smith has suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Smith's valuable Private

Information; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff Smith's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Smith's Private Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant at the cost to Plaintiff Smith, including the difference in value between the protection Plaintiff Smith's Private Information should have received from Defendant and the defective and deficient protection that Defendant actually provided; (e) lost time spent in response to the Data Breach reviewing various accounts and financial information to detect potential fraud and ID theft; and (f) continued risk to Plaintiff Smith's Private Information, which remains in the possession of Defendant and will remain vulnerable to further breaches so long as Defendant fails to take appropriate and adequate measures to protect it.

***Plaintiff Joanna Smithback***

279. On or about March 31, 2026, Plaintiff Smithback received a Notice via email from Defendant informing her that her Private Information had been compromised as part of the Data Breach.

280. Defendant obtained Plaintiff Smithback's information during Plaintiff's employment with Defendant and through the onboarding process. Plaintiff Smithback would not have entrusted her Private Information to Defendant had she known of Defendant's lax data security policies.

281. Plaintiff Smithback is very careful about sharing her Private Information. Plaintiff Smithback always makes a point to store any documents containing her Private Information in a safe and secure location. For instance, Plaintiff Smithback does not knowingly transmit unencrypted Private Information over the internet and always shreds financial documents.

282. Plaintiff Smithback only provided her Private Information to Defendant because she understood that Defendant would take reasonable measures to protect it, consistent with state and federal law and industry standards.

283. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Smithback's Private Information to theft by cybercriminals.

284. On information and belief, Plaintiff Smithback's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

285. Plaintiff Smithback has suffered actual injury from the exposure and theft of her Private Information—which violates her right to privacy.

286. Plaintiff Smithback also suffered actual injury in the form of damages to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

287. As a result of the Data Breach, Plaintiff Smithback has spent time and made reasonable efforts to mitigate the impact of the Data Breach including, but not limited to, researching the Data Breach, inquiring about the Data Breach, and monitoring credit card and financial accounts for fraudulent or suspicious activity. Plaintiff Smithback estimates that she has spent approximately three (3) hours to date mitigating the impact of the Data Breach.

288. As a result of the Data Breach, Plaintiff Smithback has experienced stress, anxiety, and concern due to the loss of privacy and impact of cybercriminals accessing and misusing her Private Information. Plaintiff Smithback understandably fears that criminals will use her Private Information to commit identity theft.

289. Defendant deprived Plaintiff Smithback of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her about the Data Breach.

290. Plaintiff Smithback is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Smithback about the Data Breach in a timely fashion.

291. On information and belief, Plaintiff Smithback's phone number and email were compromised as a result of the Data Breach. Indeed, following the Data Breach, Plaintiff Smithback began suffering a significant increase in spam and phishing calls, text messages, and emails. These spam and phishing calls, texts, and emails suggest that her Private Information is now in the hands of cybercriminals.

292. On information and belief, Plaintiff Smithback's phone number and email were compromised as a result of the Data Breach. Indeed, following the Data Breach, Plaintiff Smithback began suffering a significant increase in spam and phishing calls, text messages, and emails. These spam and phishing calls, texts, and emails suggest that her Private Information is now in the hands of cybercriminals. Plaintiff Smithback has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

293. Plaintiff Smithback has suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Smithback's valuable Private Information; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff Smithback's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Plaintiff Smithback's Private Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant at the cost to Plaintiff Smithback, including the

difference in value between the protection Plaintiff Smithback's Private Information should have received from Defendant and the defective and deficient protection that Defendant actually provided; (e) lost time spent in response to the Data Breach reviewing various accounts and financial information to detect potential fraud and ID theft; and (f) continued risk to Plaintiff Smithback's Private Information, which remains in the possession of Defendant and will remain vulnerable to further breaches so long as Defendant fails to take appropriate and adequate measures to protect it.

***Plaintiff Vineeth Ananthula***

294. On or about March 31, 2026, Plaintiff Ananthula received a Notice via email from Defendant informing him that his Private Information had been compromised as part of the Data Breach.

295. In February 2025, Plaintiff Ananthula created a Mercor account, submitted his credentials and resume information, and completed a Mercor AI interview. He never accepted a Mercor position or performed services through Mercor. Plaintiff Ananthula requested that his interview video, interview-derived analytics, and algorithmic assessments be deleted but never received proof that his AI interview, the underlying video, or the algorithmic analysis derived from it had been deleted or destroyed.

296. Plaintiff Ananthula provided Mercor with Private Information in reliance on Mercor's representations and now faces ongoing risks of misuse, impersonation, deepfake abuse, and continuing retention of his interview data and associated AI-generated assessments.

297. 296. Plaintiff Ananthula is very careful about sharing his Private Information. Plaintiff Ananthula always makes a point to store any documents containing his Private Information in a safe and secure location. For instance,

62

Plaintiff Ananthula does not knowingly transmit unencrypted Private Information over the internet and always shreds financial documents.

298. Plaintiff Ananthula only provided his Private Information to Defendant because he understood that Defendant would take reasonable measures to protect it, consistent with state and federal law and industry standards.

299. As a result of its inadequate cybersecurity, Defendant exposed Plaintiff Ananthula's Private Information to theft by cybercriminals.

300. On information and belief, Plaintiff Ananthula's Private Information has already been published—or will be published imminently—by cybercriminals on the Dark Web.

301. Plaintiff Ananthula has suffered actual injury from the exposure and theft of his Private Information—which violates his right to privacy.

302. Applicants who never performed a single hour of work for Mercor— including Plaintiff Ananthula—were nevertheless required to surrender highly sensitive personal, professional, financial, interview, and in some instances biometric information.

303. Plaintiff Ananthula has suffered actual and ongoing harm because Mercor has never confirmed deletion of his AI interview or associated algorithmic analysis. He now faces continuing risks of impersonation, deepfake misuse, and long-term retention and reuse of his interview data.

304. Plaintiff Ananthula also suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendant was required to adequately protect.

305. As a result of the Data Breach, Plaintiff Anathula has spent time and made reasonable efforts to mitigate the impact of the Data Breach including, but not limited to, researching the Data Breach, inquiring about the Data Breach, and

monitoring credit card and financial accounts for fraudulent or suspicious activity. Plaintiff Anathula estimates that he has spent approximately ten (10) hours to date mitigating the impact of the Data Breach.

306. As a result of the Data Breach, Plaintiff Ananthula has experienced stress, anxiety, and concern due to the loss of privacy and impact of cybercriminals accessing and misusing his Private Information. Plaintiff Ananthula understandably fears that criminals will use his Private Information to commit identity theft.

307. Defendant deprived Plaintiff Ananthula of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Data Breach.

308. Plaintiff Ananthula is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Ananthula about the Data Breach in a timely fashion.

309. Plaintiff Ananthula has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

310. Plaintiff Ananthula has suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff Ananthula's valuable Private Information; (b) the imminent and certain impending injury flowing from fraud and identity theft posed by Plaintiff Ananthula's Private Information being placed in the hands of cybercriminals; (c) damages to and/or diminution in value of Ananthula's Private Information that was entrusted to Defendant; (d) damages unjustly retained by Defendant at the cost to Plaintiff Ananthula, including the difference in value between the protection Plaintiff Ananthula's Private Information should have received from Defendant and the defective and deficient protection that Defendant actually provided; (e) lost time spent in response to the Data Breach reviewing

various accounts and financial information to detect potential fraud and ID theft; and (f) continued risk to Plaintiff Ananthula's Private Information, which remains in the possession of Defendant and will remain vulnerable to further breaches so long as Defendant fails to take appropriate and adequate measures to protect it.

## CLASS ACTION ALLEGATIONS

311. Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

312. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All United States residents whose Private Information was actually or potentially accessed during the Mercor Data Breach; including all individuals who received notice of the Data Breach.

Plaintiff Smith also seeks to represent a California Subclass defined as follows:

> All California residents whose Private Information was actually or potentially accessed during the Mercor Data Breach; including all individuals who received notice of the Data Breach.

313. The Nationwide Class and the Subclasses are collectively referred to herein as the "Class."

314. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

315. Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

316. Numerosity, Fed. R. Civ. P. 23(a)(1): Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are at least multiple thousands of individuals who were emailed notice by Defendant of the Data Breach. Tens of thousands of individuals had their Private Information compromised in this Data Breach. The identities of Class Members are ascertainable through Defendant's records, Class Members' records, publication notice, self-identification, and other means.

317. Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

   a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

   b. Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

   c. Whether Defendant had duties not to use the Private Information of Plaintiffs and Class Members for non-business purposes;

   d. Whether Defendant failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

   e. Whether and when Defendant actually learned of the Data Breach;

   f. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

   g. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

   h. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the

information compromised in the Data Breach;

i. Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

k. Whether Defendant violated the consumer protection statutes invoked herein;

l. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

m. Whether Plaintiffs and Class Members are entitled to restitution as a result of Defendant's wrongful conduct; and

n. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

318. Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Data Breach, due to Defendant's misfeasance.

319. Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

320. Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

321. Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

322. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be

recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

323. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

324. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

325. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

326. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

327. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

 a. Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

e. Whether Defendant breached the implied contract;

f. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members; and

i. Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## CAUSES OF ACTION

### COUNT ONE
### NEGLIGENCE
**(On behalf of Plaintiffs and the Nationwide Class)**

328. Plaintiffs incorporate by reference all allegations of the preceding

paragraphs as though fully set forth herein.

329. Defendant solicited, gathered, and stored the Private Information of Plaintiffs and the Class as part of the operation of its business and in order to gain profit from connecting Plaintiffs to employment opportunities and monetizing their Data.

330. All Plaintiffs and the Class Members entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their Private Information for employment/business purposes only, and/or not disclose their Private Information to unauthorized third parties.

331. Upon accepting and storing the Private Information of Plaintiffs and Class Members, Defendant undertook and owed a duty to Plaintiffs and Class members to exercise reasonable care to secure and safeguard that information and to use secure methods to do so.

332. Defendant had full knowledge of the sensitivity of the Private Information, the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully disclosed, and the importance of adequate security.

333. Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices on the part of Defendant. Plaintiffs and the Class Members had no ability to protect their Private Information that was in Defendant's possession. As such, a special relationship existed between Defendant and Plaintiffs and the Class.

334. Defendant was in an exclusive position to guard against the cyberattack and Plaintiffs and Class Members had no way to audit or verify the integrity of Defendant's data security practices. Plaintiffs and Class Members relied on Defendant to exercise its judgment in implementing proper data security practices.

71

335. Defendant was well aware of the fact that cyber criminals routinely target large human resources corporations through cyberattacks in an attempt to steal sensitive personal information.

336. Defendant owed Plaintiffs and the Class Members a common law duty to use reasonable care to avoid causing foreseeable risk of harm to Plaintiffs and the Class when obtaining, storing, using, and managing personal information, including taking action to reasonably safeguard such data and providing notification to Plaintiffs and the Class Members of any breach in a timely manner so that appropriate action could be taken to minimize losses.

337. Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures also have recognized the existence of a specific duty to reasonably safeguard personal information.

338. Defendant had duties to protect and safeguard the Private Information of Plaintiffs and the Class from being vulnerable to cyberattacks by taking common-sense precautions when dealing with sensitive Private Information. Additional duties that Defendant owed Plaintiffs and the Class include:

   a. To exercise reasonable care in designing, implementing, maintaining, monitoring, and testing Defendant's networks, systems, email accounts, protocols, policies, procedures and practices to ensure that Plaintiffs' and Class Members' Private Information was adequately secured from impermissible release, disclosure, and publication;

   b. To protect Plaintiffs' and Class Members' Private Information

72

in its possession by using reasonable and adequate security procedures and systems;

 c. To implement processes to quickly detect a data breach, security incident, or intrusion involving its business email system, networks and servers; and

 d. To promptly notify Plaintiffs and Class Members of any data breach, security incident, or intrusion that affected or may have affected their Private Information.

339. Only Defendant was in a position to ensure that its systems and protocols were sufficient to protect the Private Information that Plaintiffs and the Class had entrusted to it.

340. Defendant breached its duty of care by failing to adequately protect Plaintiffs' and Class Members' Private Information. Defendant breached its duties by, among other things:

 a. Failing to exercise reasonable care in obtaining, retaining securing, safeguarding, deleting, and protecting the Private Information in its possession;

 b. Failing to protect the Private Information in its possession by using reasonable and adequate security procedures and systems;

 c. Failing to adequately and properly audit, test, and train its employees to avoid phishing emails;

 d. Failing to use adequate email security systems, including industry standard SPAM filters, DMARC enforcement, and/or Sender Policy Framework enforcement to protect against phishing emails;

 e. Failing to adequately and properly audit, test, and train its employees regarding how to properly and securely transmit and

73

store Private Information;

f.    Failing to adequately train its employees to not store Private Information longer than absolutely necessary for the specific purpose that it was sent or received;

g.    Failing to consistently enforce security policies aimed at protecting Plaintiffs' and the Class's Private Information;

h.    Failing to implement processes to quickly detect data breaches, security incidents, or intrusions; and

i.    Failing to promptly notify Plaintiffs and Class Members of the Data Breach that affected their Private Information.

341. Defendant's willful failure to abide by these duties was wrongful, reckless, and grossly negligent in light of the foreseeable risks and known threats.

342. As a proximate and foreseeable result of Defendant's grossly negligent conduct, Plaintiffs and the Class have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

343. Through Defendant's acts and omissions described herein, including but not limited to Defendant's failure to protect the Private Information of Plaintiffs and Class Members from being stolen and misused, Defendant unlawfully breached its duty to use reasonable care to adequately protect and secure the Private Information of Plaintiffs and Class Members while it was within Defendant's possession and control.

344. Further, through its failure to provide clear notification of the Data Breach to Plaintiffs and Class Members, Defendant prevented Plaintiffs and Class Members from taking meaningful, proactive steps toward securing their Private Information and mitigating damages.

345. As a result of the Data Breach, Plaintiffs and Class Members have spent time, effort, and money to mitigate the actual and potential impact of the Data

Breach on their lives, including but not limited to, responding to fraudulent activity, closely monitoring bank account activity, and examining credit reports and statements sent from providers and their insurance companies.

346. Defendant's wrongful actions, inactions, and omissions constituted (and continue to constitute) common law negligence.

347. The damages Plaintiffs and the Class have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

348. In addition to its duties under common law, Defendant had additional duties imposed by statute and regulations, including the duties under the FTC Act. The harms which occurred as a result of Defendant's failure to observe these duties, including the loss of privacy, lost time and expense, and significant risk of identity theft are the types of harm that these statutes and regulations intended to prevent.

349. Defendant violated these statutes when it engaged in the actions and omissions alleged herein, and Plaintiffs' and Class Members' injuries were a direct and proximate result of Defendant's violations of these statutes. Plaintiffs therefore are entitled to the evidentiary presumptions for negligence *per se*.

350. Pursuant to the FTC Act, 15 U.S.C. § 45(a), Defendant owed a duty to Plaintiffs and the Class to provide fair and adequate computer systems and data security to safeguard the Private Information of Plaintiffs and the Class.

351. The FTC Act prohibits "unfair practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also formed part of the basis of Defendant's duty in this regard.

352. Defendant gathered and stored the Private Information of Plaintiffs and the Class as part of its business, which affects commerce.

353. Defendant violated the FTC Act by failing to use reasonable measures to protect the Private Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

354. Defendant breached its duties to Plaintiffs and the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and/or data security practices to safeguard Plaintiffs' and Class Members' Private Information, and by failing to provide prompt and specific notice without reasonable delay.

355. Plaintiffs and the Class are within the class of persons that the FTC Act was intended to protect.

356. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against.

357. Defendant breached its duties to Plaintiffs and the Class under these laws by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and the Class's Private Information.

358. Defendant breached its duties to Plaintiffs and the Class by unreasonably delaying and failing to provide notice of the Data Breach expeditiously and/or as soon as practicable to Plaintiffs and the Class.

359. As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered, and continue to suffer, damages arising from the Data Breach, as alleged above.

360. The injury and harm that Plaintiffs and Class Members suffered (as alleged above) was the direct and proximate result of Defendant's negligence.

361. Plaintiffs and the Class have suffered injury and are entitled to actual and punitive damages in amounts to be proven at trial.

## COUNT TWO
## BREACH OF IMPLIED CONTRACT
**(On behalf of Plaintiffs and the Nationwide Class)**

362. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

363. Plaintiffs and Class Members were required to provide Defendant with their Private Information in order to receive employment opportunities.

364. Plaintiffs and Class Members entrusted their Private Information to Defendant. In doing so, they entered into implied contracts in which Defendant agreed to comply with its statutory and common law duties to protect their Private Information and to timely notify them in the event of a Data Breach.

365. Plaintiffs allowed Defendant to monetize their personal information and to derive revenue from using the Mercor service to connect them with employment opportunities.

366. A meeting of the minds occurred when Plaintiffs and Class Members agreed to, and did, provide their Private Information to Defendant with the reasonable understanding that their Private Information would be adequately protected from foreseeable threats. This inherent understanding exists independent of any other law or contractual obligation any time that highly sensitive Private Information is exchanged as a condition of receiving services. It is common sense that but for this implicit and/or explicit agreement, Plaintiffs and Class Members would not have provided their Private Information to Defendant.

367. Based on Defendant's conduct, representations, legal obligations, and acceptance of Plaintiffs' and the Class Members' Private Information, Defendant had an implied duty to safeguard their Private Information through the use of reasonable industry standards. This implied duty was reinforced by Defendant's representations in its Privacy Policy.

77

368. Defendant breached the implied contracts by failing to safeguard Plaintiffs' and Class Members' Private Information, including through industry standard technologies like encryption, and failing to provide them with timely and accurate notice of the Data Breach.  Indeed, it took Defendant *weeks* to warn Plaintiffs and Class Members of their imminent risk of identity theft. Defendant also failed to notify Plaintiffs and the Class Members what information was involved and how the Data Breach occurred, leaving Plaintiffs and the Class in the dark as to the extent of the information that was compromised.

369. As a direct and proximate result of Defendant's breach of implied contract, Plaintiffs and the Class Members have suffered damages, including foreseeable consequential damages that Defendant knew about when it requested Plaintiffs' and the Class Members' Private Information.

### COUNT THREE
### UNJUST ENRICHMENT
**(On behalf of Plaintiffs and the Nationwide Class)**

370. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

371. Plaintiffs and the Class bring this claim in the alternative to all other claims and remedies at law.

372. Plaintiffs and Class Members who are or were contractors of Defendant conferred a monetary benefit upon Defendant in the form of their labor and services. Defendant understood this benefit. Plaintiffs and Class Members provided Defendant their labor and Private Information on the understanding that Defendant would pay the administrative costs of reasonable data privacy and security practices and procedures from the revenue Defendant derived therefrom. In exchange, Plaintiffs and Class Members should have received adequate protection and data security for such Private Information held by Defendant.

373. Plaintiffs and Class Members also conferred a monetary benefit upon Defendant in the form of their Private Information. Defendant used the Private Information provided by Plaintiffs to refine their products and the products of their clients and to generate profit. Without receipt of this information, Defendant could not conduct its business. Plaintiffs reasonably expected that a portion of the profit generated using their information and labor would be used to provide adequate data security.

374. By receiving kickbacks for successfully placing clients on projects and utilizing provided Private Information to improve its own systems, Defendant was not merely acting as a staffing agency or employer, but directly profiting off the provision of Plaintiffs' and the Class's Private Information.

375. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information.

376. Defendant collected, maintained, and stored the Private Information of Plaintiffs and Class Members as part of its business operations and to gain profits through using it to improve its systems and place clients in roles for which it received compensation. As such, Defendant had direct knowledge of the monetary benefits conferred upon it.

377. Defendant, by way of its affirmative actions and omissions knowingly and deliberately enriched itself by saving the costs it reasonably and contractually should have expended on reasonable data privacy and security measures to secure Plaintiffs' and Class Members' Private Information.

378. Instead of providing a reasonable level of security, training, and protocols that would have prevented the Data Breach, as described above and as is common industry practice among companies entrusted with similar Private Information, Defendant, upon information and belief, instead consciously and

79

opportunistically calculated to increase its own profits at the expense of Plaintiffs and Class Members.

379. Defendant failed to implement—or adequately implement—data security practices, procedures, and programs to secure sensitive Private Information, including without limitation those industry standard data security practices, procedures, and programs discussed herein.

380. As a direct and proximate result of Defendant's decision to profit rather than provide adequate data security, Plaintiffs and Class Members suffered and continue to suffer actual damages, including (i) the amount of the savings and costs Defendant reasonably and contractually should have expended on data security measures to secure Plaintiffs' Private Information, (ii) time and expenses mitigating harms, (iii) diminished value of Private Information, (iv) loss of privacy, (v) harms as a result of identity theft; and (vi) an increased risk of future identity theft.

381. Defendant, upon information and belief, has therefore engaged in opportunistic and unethical conduct by profiting from conduct that it knew would create a significant and highly likely risk of substantial and certainly impending harm to Plaintiffs and the Class in direct violation of Plaintiffs' and Class Members' interests. As such, it would be inequitable, unconscionable, and unlawful to permit Defendant to retain the benefits it derived as a consequence of its wrongful conduct.

382. Plaintiffs have no adequate remedy at law.

383. Accordingly, Plaintiffs and the Class are entitled to relief in the form of restitution and disgorgement of all ill-gotten gains, which should be put into a common fund to be distributed to Plaintiffs and the Class.

**COUNT FOUR**
**INVASION OF PRIVACY UNDER CALIFORNIA'S CONSTITUTION (ARTICLE 1, § 1)**
**(On Behalf of Plaintiff Smith and the California Subclass)**

384. Plaintiff Smith, individually and on behalf of the California Subclass, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

385. Plaintiff Smith and California Subclass Members have an interest in: (1) precluding the dissemination and/or misuse of their Private Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to carry out duties within the scope of their contracts with Mercor without the risk of their data being exfiltrated.

386. Plaintiff Smith and California Subclass Members had a reasonable expectation that their communications, identity, and other data would remain confidential, and Defendant would keep its platform secure.

387. By failing to secure Plaintiff Smith's and California Subclass Members' personal data, Defendant intentionally invaded Plaintiff Smith's and California Subclass Members' right to privacy under the California Constitution.

388. This invasion of privacy is serious in nature, scope, and impact because it relates to consumers' Private Information. Moreover, it constitutes an egregious breach of the societal norms underlying the right of privacy.

389. As a result of Defendant's actions, Plaintiff Smith and California Subclass Members have suffered harm and injury, including but not limited to invasion of their privacy rights.

390. Plaintiff Smith and California Subclass Members have been damaged as a direct and proximate result of Defendant's invasion of privacy and are entitled to just compensation, including monetary damages.

391. Plaintiff Smith and California Subclass Members seek appropriate relief for this injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests.

392. Plaintiff Smith and California Subclass Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff Smith and California Subclass Members in conscious disregard of their rights.

393. Such damages are needed to deter Defendant from engaging in such conduct in the future.

394. Plaintiff Smith also seeks other such relief as the Court may deem just and proper.

**COUNT FIVE**
**VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT**
**Cal. Civ. Code § 1798.100, *et seq.***
**(On Behalf of Plaintiff Smith and the California Subclass)**

395. Plaintiff Smith ("Plaintiff" for purposes of this count) incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

396. The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.150(a), creates a private cause of action for violations of the CCPA.

397. Section 1798.150(a)(1) of the CCPA provides, "[a]ny consumer whose nonencrypted or nonredacted personal information, as defined by [Civil Code section 1798.81.5(d)(1)(A)] . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

398. Defendant is a "business" under § 1798.140(d) in that it is a corporation organized for profit or financial benefit of its shareholders or other owners, with gross revenues in excess of $25 million and "collects consumers' personal

information, or on the behalf of which such information is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information, that does business in the state of California."

399. Defendant maintained Plaintiff Smith's and California Subclass Members' Private Information in a form that allowed criminals to access it

400. Plaintiff and California Subclass Members are covered "consumers" under § 1798.140(i) in that they are natural persons who are California residents.

401. Plaintiff Smith's and California Subclass Members' personal information, as defined by Civil Code section 1798.140(v)(1), was subject to unauthorized access and exfiltration, theft, or disclosure. The Data Breach described herein exposed, without limitation, candidate profiles, which may include Social Security numbers, addresses, telephone numbers, passport numbers, driver's license or state identification card numbers, employment, employment history, commercial information, professional or employment-related information, or electronic or visual information

402. Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the California Subclass Members' Private Information and that the risk of a data breach or theft was highly likely. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the Private Information of Plaintiff and the California Subclass Members. Specifically, Defendant subjected Plaintiff's and the California Subclass Members' nonencrypted and nonredacted Private Information to unauthorized access and exfiltration, theft, or disclosure as a result of Defendant's violations of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, as described herein.

403. As a direct and proximate result of Defendant's violation of its duties,

the unauthorized access and exfiltration, theft, or disclosure of Plaintiff's and California Subclass Members' Private Information included exfiltration, theft, or disclosure through Defendant's servers, systems, and website, and/or the Dark Web, where hackers further disclosed the personal identifying information alleged herein.

404. As a direct and proximate result of Defendant's acts and/or omissions, Plaintiff and the California Subclass Members were injured and lost money or property, including but not limited to the loss of Plaintiff's and California Subclass Members' legally protected interest in the confidentiality and privacy of their Private Information, stress, fear, and anxiety, nominal damages, and additional losses described above.

405. Section 1798.150(b) specifically provides that "[n]o [prefiling] notice shall be required prior to an individual consumer initiating an action solely for actual pecuniary damages."

406. Plaintiff and California Subclass Members seek injunctive or other equitable relief to ensure Defendant hereinafter adequately safeguards Private Information by implementing reasonable security procedures and practices. Such relief is particularly important because Defendant continues to hold Private Information, including Plaintiff's and California Subclass Members' Private Information. Plaintiff and California Subclass Members have an interest in ensuring that their Private Information is reasonably protected, and Defendant has demonstrated a pattern of failing to adequately safeguard this information.

407. As of April 27, 2026, Plaintiff Smith mailed a CCPA notice letter to Defendant's counsel of record, detailing the specific provisions of the CCPA that Defendant has violated and continues to violate. On May 27, 2026, Defendant mailed a response letter to Plaintiff's counsel but Defendant failed to present a cure of its violations and did not represent that it had recovered Plaintiff's or California

Subclass Members' Private Information or the eliminate the future risk that the Private Information will be misused by the cybercriminals who accessed such Private Information in the Data Breach. Because Defendant failed to cure within 30 days of receipt of Plaintiff Smith's letter, Plaintiff Smith seeks statutory damages as permitted by the CCPA.

408. As alleged herein, an actual controversy has arisen and now exists as to whether Defendant implemented and maintained reasonable security procedures and practices appropriate to the nature of the information so as to protect the personal information under the CCPA.

409. A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendant.

**COUNT SIX**
**VIOLATION OF THE UNFAIR COMPETITION LAW**
**Bus. & Prof. Code § 17200 et seq. ("UCL")**
**(On Behalf of Plaintiff Smith and the California Subclass)**

410. Plaintiff Smith ("Plaintiff" for purposes of this Count) repeats and re-alleges the preceding factual allegations, as if fully set forth herein.

411. Plaintiff pleads this claim for equitable relief, including restitution and injunctive relief, in the alternative to his claims for damages.

412. The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

413. Defendant's actions as alleged herein in this Class Action Complaint constitute an "unlawful" practice as encompassed by Cal. Bus. & Prof. Code §§ 17200 *et seq.* because Defendant's actions: (a) violated the California Consumer Records Act, Cal. Civ. Code §§ 1798.80 *et seq.*, (b) violated the CCPA, Cal. Civ.

85

Code §§ 1798.100 *et seq.*, (c) constituted negligence; and (d) violated federal law and regulations, including the FTC Act.

414. Defendant's actions as alleged in this Class Action Complaint also constitute an "unfair" practice as encompassed by Cal. Bus. & Prof. Code §§ 17200 *et seq.*, because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious.

415. The harm caused by Defendant's wrongful conduct outweighs any utility of such conduct and has caused—and will continue to cause—substantial injury to the California Subclass, including Plaintiff. There were ample reasonably available alternatives that would have furthered Defendant's legitimate business practices, including using industry-standard technologies to protect data (e.g., two-factor authorization, effective encryption and anonymization, compartmentalization of sensitive data, software patches, limiting how much data any user may access, and the purging of data no longer necessary for Defendant's services).

416. Defendant also unreasonably delayed in notifying Plaintiff and California Subclass Members regarding the unauthorized release and disclosure of their Private Information.

417. Additionally, Defendant's conduct was "unfair" because it violated the legislatively declared policies reflected by California's strong data-breach and online-privacy laws, including the California Consumer Records Act, Cal. Civ. Code §§ 1798.80, *et seq.*, the CCPA, Cal. Civ. Code §§ 1798.100, *et seq.*, and the California constitutional right to privacy, Cal. Const. Art. 1, § 1.

418. Defendant's conduct also is deceptive in violation of the UCL. Defendant's fraudulent business acts and practices include:

a. Failing to adequately secure the personal information of Plaintiff and California Subclass Members from disclosure to unauthorized third parties or for improper purposes;

b. Enabling the disclosure of personal and sensitive facts about Plaintiff and California Subclass Members in a manner highly offensive to a reasonable person;

c. Enabling the disclosure of personal and sensitive facts about Plaintiff and California Subclass Members without their informed, voluntary, affirmative, and clear consent;

d. Omitting, suppressing, and concealing the material fact that Defendant did not reasonably or adequately secure Plaintiff's and California Subclass Members' personal information.

419. Defendant's omissions were material because they were likely to deceive reasonable consumers about the adequacy of its data security and ability to protect the confidentiality of Plaintiff's and California Subclass Members' personal information.

420. The harm from Defendant's conduct was not reasonably avoidable by consumers. Plaintiff and California Subclass Members were required to provide their Private Information to Defendant to apply for employment. Plaintiff and California Subclass Members did not know of, and had no reasonable means of discovering, that their information would be exposed to hackers through inadequate data security measures.

421. There were reasonably available alternatives that would have furthered Defendant's business interests of electronically transferring its customers' information while protecting Private Information.

422. A reasonable person would regard Defendant's derelict data security and the Data Breach as important, material facts that could and should have been disclosed.

87

423. As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiff lost money or property because his sensitive personal information experienced a diminution of value and because he devoted additional time to monitoring his financial accounts for fraudulent activity. Plaintiff faces ongoing and impending damages related to theft of his Private Information.

424. Defendant's wrongful practices constitute a continuing course of unfair competition because, on information and belief, Defendant has failed to remedy the lax security practices or even fully notify all affected California persons. Plaintiff and the California Subclass seek equitable relief pursuant to Cal. Bus. & Prof. Code § 17203 to end Defendant's wrongful practices and require Defendant to maintain adequate and reasonable security measures to protect the Private Information of Plaintiff and the California Subclass.

425. Plaintiff and California Subclass Members lack an adequate remedy at law because the injuries here include an imminent risk of identity theft and fraud that can never be fully remedied through damages, ongoing identity theft and fraud, as well as long term incalculable risk associated with medical fraud.

426. Further, if an injunction is not issued, Plaintiff and California Subclass Members will suffer irreparable injury. The risk of another such breach is real, immediate, and substantial. Defendant has still not provided adequate information on the cause and scope of the Data Breach. Plaintiff and California Subclass Members lack an adequate remedy at law that will reasonably protect against the risk of a further breach.

427. Plaintiff and the California Subclass also seek an order requiring Defendant to make full restitution of all monies it received through its wrongful conduct, along with all other relief permitted under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

88

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray for judgment against Defendant as follows:

      a.    An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

      b.    A judgment in favor of Plaintiffs and the Class awarding them appropriate monetary relief, including actual damages, statutory damages, restitution, attorney fees, expenses, costs, and such other and further relief as is just and proper;

      c.    An order providing injunctive and other equitable relief as necessary to protect the interests of the Class and the general public as requested herein, including, but not limited to:

           i.    Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

           ii.    Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

           iii.    Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

           iv.    Ordering that Defendant segment customer data by,

among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

v. Ordering that Defendant cease transmitting Private Information via unencrypted email;

vi. Ordering that Defendant cease storing Private Information in email accounts;

vii. Ordering that Defendant purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

viii. Ordering that Defendant conduct regular database scanning and securing checks;

ix. Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

x. Ordering Defendant to meaningfully educate its current, former, and prospective employees and subcontractors about the threats faced as a result of the loss of financial and Private Information to third parties, as well as the steps they must take to protect against such occurrences;

d. An order requiring Defendant to pay the costs involved in notifying the Class members about the judgment and administering the claims process;

e. A judgment in favor of Plaintiffs and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys'

fees, costs and expenses as allowable by law; and

f.    An award of such other and further relief as this Court may deem just and proper

## JURY DEMAND

Plaintiffs hereby demand that this matter be tried before a jury on all issues so triable.

Dated: June 18, 2026                              Respectfully Submitted,

/s/ John J. Nelson
John J. Nelson (SBN 317598)
**MILBERG, PLLC**
280 S. Beverly Drive-Penthouse
Beverly Hills, CA 90212
Telephone: (858) 209-6941
Email: jnelson@milberg.com

*Interim Lead Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 18, 2026, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF. Copies of the foregoing document will be served upon interested counsel via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ John J. Nelson
John J. Nelson